**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

**CORDELLRA MCCALEY**                                                **PLAINTIFF**

**v.**                                          **CIVIL ACTION NO. 5:18-cv-43-DCB-MTP**

**GLORIA PERRY, ET AL.**                                    **DEFENDANTS**

**REPORT AND RECOMMENDATION**

THIS MATTER is before the Court on the Motion for Summary Judgment [97] filed by Defendants Dr. William Barr, Dr. James Burke, and Dr. Keith Stokes; the Motion for Summary Judgment [101] filed by Defendant Gloria Perry; and the Motion for Summary Judgment [104] filed by Jody Bradley, Mary Groom, Karen Brown, and Olivia Trask. Having considered the Motions, the record, and the applicable law, the undersigned recommends that the Motions [97] [101] [104] be granted; that Plaintiff's claims against Dr. William Barr, Dr. James Burke, Dr. Keith Stokes, and Gloria Perry be dismissed with prejudice; and that Plaintiff's claims against Jody Bradley, Mary Groom, Karen Brown, and Olivia Trask be dismissed without prejudice.

**BACKGROUND**

On April 26, 2018, Plaintiff Cordellra McCaley, proceeding *pro se* and *in forma pauperis*, filed his complaint pursuant to 42 U.S.C. § 1983. The allegations in Plaintiff's complaint occurred while he was incarcerated as a post-conviction inmate at the Mississippi State Penitentiary ("Parchman"), Central Mississippi Correctional Facility ("CMCF"), and Wilkinson County Correctional Facility ("WCCF"). In his complaint and as clarified in his testimony at the *Spears*[1] hearing, Plaintiff alleges that Defendants violated his constitutional

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

1

rights by failing to provide him adequate medical care and by failing to provide him adequate protection from harm.

*Plaintiff's Allegations*

Denial of Adequate Medical Care

On September 6, 2015, while housed at Parchman Penitentiary, Plaintiff was allegedly attacked by another inmate, resulting in injuries to his face and eye. After the attack, Plaintiff was treated at a hospital in Leflore County and sent to the University of Mississippi Medical Center ("UMMC"). Thereafter, Plaintiff returned to Parchman, and on or about September 8, 2015, Defendant Dr. William Barr examined him.

Plaintiff was later transferred to another facility and was taken to UMMC, where he underwent surgery. Plaintiff later returned to Parchman, where Dr. Barr allegedly stated that he would make sure Plaintiff received treatment from an outside provider regarding optic nerve damage. Before Plaintiff received additional treatment, however, he was transferred to another facility. Plaintiff claims that additional surgery was necessary, but not provided.

Sometime in September of 2015, shortly after the alleged attack, Plaintiff was transferred to CMCF, where Defendant Dr. Keith Stokes visited him on multiple occasions. Dr. Stokes sent him to outside medical providers, but failed to make sure that Plaintiff received additional surgery. Plaintiff was also housed at WCCF, where Defendant Dr. James Burke treated him. Dr. Burke sent Plaintiff to multiple outside medical providers. Dr. Burke, however, failed to make sure that Plaintiff received additional surgery.

Plaintiff admits that he does not know whether any of the Defendants made the decision denying the additional surgery, but he claims that all three of these doctors should have made sure he received the surgery.

Plaintiff also alleges that his family complained about his medical care to Defendant Gloria Perry, who he claims is or was the MDOC official in charge of the nurses and the final decision maker regarding prisoner appointments with outside medical providers.  According to Plaintiff, he did not speak to Perry but was listening on the phone when his family members were complaining to her about Plaintiff's need for medical treatment.  Perry allegedly instructed his family members to continue to complain and have Plaintiff submit sick call requests.

Failure to Protect

On May 20, 2018, while Plaintiff was housed at WCCF, an inmate assaulted him with a knife.  Prior to the assault, Plaintiff allegedly informed Defendants Karen Brown and Jody Bradley that the inmate was threatening him.  Plaintiff alleges that he wrote grievances and spoke to Bradley regarding the inmate.  He also alleges that he spoke to Brown and alleges that the inmate told Brown he would attack Plaintiff.  According to Plaintiff, Brown and Bradley failed to protect him.

After the May 20, 2018 attack, Plaintiff was placed in administrative segregation, where Defendant Olivia Trask worked.  According to Plaintiff, Trask did not want Plaintiff placed in segregation because he regularly submitted grievances against officers.  Allegedly, Trask attempted to have Plaintiff transferred to "F Pod," where known gang members were housed. Trask asked Defendant Mary Groom to move Plaintiff to F Pod.  After Plaintiff refused to go to F Pod, Groom issued him a rule violation report.

Plaintiff was not transferred to F Pod, but was transferred to "LMN Pod" in August of 2018.  While in LMN Pod, Plaintiff was allegedly threatened and punched by inmates. According to Plaintiff, Trask knew that the inmates in LMN Pod wanted to harm him.  Plaintiff was transferred back to administrative segregation in October of 2018.

As relief, Plaintiff requests monetary damages and injunctive relief in the form of an order requiring Defendants to make WCCF safer for the inmates.

*Defendants' Motions for Summary Judgment*

On May 15, 2019, Defendants Dr. Barr, Dr. Burke, and Dr. Stokes filed their Motion for Summary Judgment [97]; Defendant Perry filed her Motion for Summary Judgment [101]; and Defendants Bradley, Brown, Groom, and Trask filed their Motion for Summary Judgment [104]. On June 5, 2019, Plaintiff filed responses to the Motions. *See* Notices [108] [109] [110]; Memorandum [111]. On November 21, 2019, the Court afforded Plaintiff an opportunity to file a supplemental response to the Motions for Summary Judgment. *See* Order [129]. On January 10, 2020, Plaintiff filed supplemental responses. *See* [130] [131] [132] [133] [134] [135].

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation and internal quotation marks omitted). The nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)). "An issue is 'genuine' if the evidence is sufficient for a reasonable [fact-finder] to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812 (citation omitted).

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)). When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted). Summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

## ANALYSIS

### *Denial of Adequate Medical Care*

Plaintiff's allegations regarding his medical care amount to claims against Defendants Perry, Dr. Barr, Dr. Burke, and Dr. Stokes for violations of the Eighth Amendment. "Prison officials violate the constitutional proscription against cruel and unusual punishment when they are deliberately indifferent to a prisoner's serious medical needs, as doing so constitutes unnecessary and wanton infliction of pain." *Davidson v. Texas Dep't of Criminal Justice*, 91 Fed. App'x 963, 964 (5th Cir. 2004) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Deliberate indifference "is an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.

2001)). The test for establishing deliberate indifference is "one of subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A plaintiff must show that a defendant's "response indicate[d] that the [defendant] subjectively intended that harm occur." *Thompson v. Upshur County*, 245 F.3d 447, 458-59 (5th Cir. 2001).

An official is not deliberately indifferent unless he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Id*. at 838. Plaintiff must "submit evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Davidson*, 91 Fed. App'x at 965 (quoting *Domino*, 239 F.3d at 756). "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 333-34 (1986). Plaintiff is not entitled to the "best" medical treatment available. *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978); *Irby v. Cole*, 2006 WL 2827551, at *7 (S.D. Miss. Sept. 25, 2006). Further, a prisoner's "disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 2001).

In support of their Motions for Summary Judgment [97] [101], Defendants argue, *inter alia*, that they are entitled to judgment as a matter of law because Plaintiff has failed to demonstrate that any Defendant acted with deliberate indifference in treating Plaintiff. Defendants submitted multiple exhibits, including a transcript of the *Spears* hearing and

Plaintiff's medical records. Plaintiff's medical records demonstrate that Plaintiff received extensive treatment for his injuries resulting from the September 6, 2015 attack.

Specifically, Plaintiff's medical records demonstrate that on September 6, 2015, Plaintiff was taken via ambulance to a nearby hospital, where he was treated for facial trauma, an orbital fracture, a sinus fracture, and a nasal fracture. *See* Medical Records [100] at 5-7. The next day, Plaintiff returned to Parchman and was admitted into the infirmary, where he received regular treatment. [100] at 7-70.

On September 15, 2015, Dr. Barr submitted a request for Plaintiff to have a specialty consultation with a maxillofacial surgeon for his orbital fracture. [100] at 53. On September 18, 2015, Plaintiff was transferred to CMCF and was admitted into the infirmary, where he received regular treatment. [100] at 69-85; [100-1] at 1-64. Dr. Stokes examined Plaintiff on September 20, 2020 and noted that Plaintiff would be undergoing surgery. [100] at 82-83. On September 21, Plaintiff was taken to an appointment with an ophthalmologist. [100] at 83. Plaintiff again saw an ophthalmologist on September 29, 2015. [100-1] at 28-31. Dr. Stokes examined Plaintiff when he returned to CMCF, and Plaintiff reported that the ophthalmologist indicated that he would need surgery. [100-1] at 30. Dr. Stokes noted that no order was provided from the ophthalmologist. [100-1] at 30. On October 9, 2015, Dr. Stokes again examined Plaintiff, noting that Plaintiff did not have an appointment with an eye surgeon for another three or four weeks and noting that the outside providers were unsure if an operation would be necessary. [100-1] at 65. Plaintiff was discharged from the CMCF infirmary and returned to the infirmary at Parchman. [100-1] at 65.

Thereafter, Plaintiff was transferred to WCCF, and on October 21, 2015, Plaintiff was taken to UMMC, where a doctor discussed surgery with Plaintiff. [100-1] at 70; [100-3] at 77-78.

On October 23, 2015, Plaintiff returned to UMMC and underwent surgery, specifically an "open reduction internal fixation of left medial orbital wall defect." [100-3] at 79. Following the surgery, Plaintiff returned to WCCF. [100-1] at 71-72.

On October 27, 2015, Plaintiff was transferred to CMCF, where Dr. Barr examined him. [100-1] at 72-75. On October 29, 2015, Plaintiff was taken to a follow-up appointment with his surgeon. [100-1] at 77-78. Thereafter, Plaintiff returned to CMCF and received regular monitoring and treatment. [100-1] at 78-99; [100-2] at 1-65. Dr. Barr monitored Plaintiff, noted his complaints, and noted that an appointment with an ophthalmologist had been scheduled. [100-2] at 36, 40, 50, 56, 58.

On November 16, 2015, Plaintiff refused to go to his appointment with an ophthalmologist. [100-2] at 61-65.[2] A nurse noted that he refused to go because he did "not know the transportation people." [100-2] at 65. A nurse practitioner informed Plaintiff that his refusal of treatment could result in the worsening of his condition, such as vision loss. [100-2] at 65.

Plaintiff was transferred to WCCF on December 21, 2015. [100-3] at 1. Dr. Burke examined Plaintiff, noting that he complained of headaches and double vision but had previously refused to go to a follow-up appointment. [100-3] at 2. Dr. Burke referred Plaintiff to optometry for input. [100-3] at 2. On January 22, 2016, an optometrist examined Plaintiff and referred him to an ophthalmologist. [100-3] at 6-7.

On April 28, 2016, Dr. Burke noted that a consultation with a craniofacial surgeon had been requested "and appears to have been approved." [100-3] at 27. On September 6, 2016, Dr.

---

[2] At the *Spears* hearing, Plaintiff testified that he refused to go to the appointment because the officers tasks with transporting him were the "same officials that got [him] stabbed in Parchmam . . . ." [97-4] at 19.

8

Burke informed Plaintiff that his appointment with a craniofacial surgeon was scheduled for later in September. [100-3] at 62. On September 23, 2016, Plaintiff was transferred to CMCF, and on October 14, 2016, a nurse referred Plaintiff to optometry. [100-3] at 63-65.

Thereafter, Plaintiff was examined in the optometry unit and was again referred to an ophthalmologist. [100-3] at 66. On February 13, 2017, Plaintiff was taken to the Jackson Eye Institute for his appointment with an ophthalmologist. [100-3] at 68. Upon his return to CMCF, he informed a nurse practitioner he needed "eye surgery." [100-3] at 68. Plaintiff submitted records from the Jackson Eye Institute which, although nearly illegible, seem to indicate that Plaintiff needed a fracture repair. [111-1] at 9.

On April 7, 2017, during an examination, Plaintiff informed a nurse practitioner that he had been hit on the left side of his face three weeks prior and that he did not "know what it is, but it's moved." [100-3] at 69. On April 18, 2017, an optometrist examined Plaintiff and noted that surgery had been discussed at the Jackson Eye Institute. [100-3] at 70. On June 19, 2017, Plaintiff was taken to an outside provider for an MRI of his face. [100-3] at 71. The outside provider recommended that Plaintiff return for "surgery of orbit" within one or two months. [100-3] at 71.

On July 7, 2017, Plaintiff was transferred to SMCI. [100-3] at 72. On September 14, 2017, he was transferred to WCCF. [100-3] at 73. On December 7, 2017, Dr. Burke requested a specialty consult for Plaintiff, and on January 12, 2018, Plaintiff was examined by an ophthalmologist. [100-3] at 74; 81-81. The ophthalmologist noted that Plaintiff had 20/20 vision in his right eye and 20/60 vision in his left eye and that, with corrective lenses, his vision improved to 20/15 for the right eye and 20/50 for the left eye. [100-3] at 81-82. The ophthalmologist noted enophthalmos, or the backward displacement of the eyeball, in Plaintiff's

left eye, but he did not recommend surgery. Instead, he recommended that Plaintiff get new prescription glasses and wear safety glasses. [100-3] at 81-82.

The evidence does not demonstrate that the actions or inactions of Defendants prevented Plaintiff from receiving adequate medical care. Plaintiff may not rest on the allegations of his pleadings, but must come forward with sufficient evidence to demonstrate a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiff has failed to come forward with evidence demonstrating that Defendants knew of and disregarded an excessive risk to his health or that Defendants' actions caused his injuries.

In his Response [131], Plaintiff argues that Defendants "committed egregious acts of negligence," but negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels*, 474 U.S. at 333-34. Plaintiff is not entitled to the "best" medical treatment available, and "disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *McMahon*, 583 F.2d at 174; *Norton*, 122 F.3d at 292.

The record demonstrates that Plaintiff's condition was assessed, monitored, and treated; he was taken to multiple appointments with outside medical professionals; he was provided multiple medications; and he underwent surgery. Plaintiff admits that the Defendants did not refuse treatment. Plaintiff was provided constant treatment by the medical staff in the prisons and was taken to see an ophthalmologist or a surgeon on at least eight occasions. Plaintiff received treatment from outside medical providers even after he refused to go for his appointment with an ophthalmologist on November 16, 2015.[3] Plaintiff has failed to make a

---

[3] The record demonstrates that Plaintiff refused to see the ophthalmologist after he was warned that his refusal of treatment could result in the worsening of his condition. [100-2] at 65.

10

showing that Defendants "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Davidson*, 91 Fed. App'x at 965 (quoting *Domino*, 239 F.3d at 756); *see also Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (holding that "[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.").

Moreover, the record does not establish that the surgery Plaintiff wanted was medically necessary. Before Plaintiff's first surgery, Dr. Stokes noted that the outside providers were unsure if an operation would be necessary. [100-1] at 65. Although some medical providers indicated Plaintiff should undergo an additional surgery, an ophthalmologist who examined Plaintiff on January 12, 2018 did not recommend surgery. [100-3] at 81-82. During the *Spears* hearing, the Plaintiff alleged that he has to close his left eye to see, but his latest examination from an ophthalmologist revealed that he had 20/60 vision in his left eye, which improved to 20/50 with corrective lenses. Because Plaintiff has failed to demonstrate that Defendants were deliberately indifferent to his serious medical needs, Defendants Perry, Dr. Barr, Dr. Burke, and Dr. Stokes are entitled to judgment as a matter of law.

### *Failure to Protect*

In their Motion for Summary Judgment [104], Defendants Bradley, Brown, Groom, and Trask first argue that Plaintiff failed to exhaust his administrative remedies prior to filing this action. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. § 1983. "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). The United States Court of Appeals for the

11

Fifth Circuit held that "[s]ince exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. Because exhaustion is an affirmative defense, Defendants bear the burden of demonstrating that Plaintiff failed to exhaust available administrative remedies. *Id*. at 266.

The Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement. *Johnson v. Ford*, 261 Fed. App'x 752, 755 (5th Cir. 2008) (citing *Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006). It is not enough to merely initiate the grievance process or to put prison officials on notice of a complaint; the grievance process must be carried through to its conclusion. *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).

Mississippi Code § 47-5-801 grants the Mississippi Department of Corrections ("MDOC") the authority to adopt an administrative review procedure at each of its correctional facilities. Pursuant to this statutory authority, the MDOC has set up an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a complaint relating to any aspect of his incarceration. *See* MISSISSIPPI DEPARTMENT OF CORRECTIONS HANDBOOK[4] at Ch. VIII.

---

[4] *See* http://www.mdoc.ms.gov/Inmate-Info/Pages/Inmate-Handbook.aspx. (Last visited January 15, 2020).

The ARP is a two-step process.[2] An inmate is required to submit his initial grievance or request, in writing, through the Inmate Legal Assistance Program ("ILAP") within thirty days of an alleged incident. If, after screening, the grievance or request is accepted into the ARP, an official will issue a First Step Response. If the inmate is unsatisfied with the First Step Response, he may continue to the Second Step by using ARP form ARP-2. *See* MISSISSIPPI DEPARTMENT OF CORRECTIONS HANDBOOK at Ch. VIII.

As previously discussed, Plaintiff's failure-to-protect claims arise from an assault which allegedly occurred on May 20, 2018 and assaults which allegedly occurred after Plaintiff was transferred to the LMN Pod at WCCF in August of 2018. In support of their Motion for Summary Judgment [104], Defendants submitted an affidavit from Janice Williams, the ARP Coordinator at WCCF, along with Plaintiff's grievances and officials' responses. [104-6]. The record shows that on July 9, 2018, Plaintiff submitted a grievance in which he complained that officers were threatening to issue rule violation reports against him because he refused to be housed in "F&G Section." [104-6] at 45-47; [111] at 8-11. Plaintiff explained in the grievance that he did not want to go to that housing unit because on May 20, 2018, his cellmate attacked him. [104-6] at 45-47; [111] at 8-11. On July 24, 2018, Janice Williams responded to the grievance with a letter, returning his grievance because it was "unclear" and "did not specify any relief sought." [104-6] at 44, 48. The letter informed Plaintiff that he could resubmit his grievance but needed to include more specific information. [104-6] at 44.

The record demonstrates that Plaintiff did not resubmit his grievance or otherwise complete the grievance process. In his Response [108], Plaintiff argues that he exhausted his

---

[2] Effective September 19, 2010, the ARP was changed from a three-step process to a two-step process. *See Threadgill v. Moore*, 2011 WL 4388832, at *3 n.6 (S.D. Miss. July 25, 2011).

administrative remedies because he filed an "A.R.P. complaint." [108] at 3.[5] However, an inmate may not simply initiate the grievance process, but must complete the process. *Wright*, 260 F.3d at 358. "[A] prisoner must complete the administrative review process in accordance with the applicable rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford*, 548 U.S. at 88. Additionally, an inmate cannot satisfy the exhaustion requirement by filing an untimely or otherwise defective grievance or appeal. *Id*. at 83-84.

"Exhaustion is no longer left to the discretion of the district court, but it is mandatory." *Id*. at 85. Plaintiff filed the instant action prior to completion of the ARP process for the grievance concerning the events at issue in this action. The grievance process must be completed *prior* to filing suit in federal court. The Fifth Circuit has stated as follows:

> District courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint. It is irrelevant whether exhaustion is achieved during the federal proceeding. Pre-filing exhaustion is mandatory, and the case must be dismissed if available administrative remedies were not exhausted.

*Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).

One of the principal purposes of the administrative exhaustion requirement is to provide fair notice to prison officials of an inmate's specific complaints so as to provide "time and opportunity to address complaints internally." *Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir.

---

[5] The undersigned assumes that Plaintiff is referring to the grievance he filed on July 9, 2018. If Plaintiff is referring to another grievance, he did not state when he allegedly submitted the grievance or when he completed the grievance process. Such a bare, unsubstantiated allegation simply would not be enough to withstand a properly supported motion for summary judgment. *Ryan v. Phillips*, 558 Fed. App'x 477, 478 (5th Cir. 2014) (inmate's "conclusory and unsubstantiated assertion that he initiated the applicable grievance procedure is insufficient to refute the lack of evidence that he filed any informal or formal grievance."). Plaintiff submitted letters he sent to Warden J. Bradley on April 16, 2018 and May 9, 2018 complaining about his cellmate, but Plaintiff does not assert that these letters were formal grievances or that the letters exhausted the multiple-step grievance process. [90-2] at 5, 7-8.

14

2004). The record demonstrates that Plaintiff failed to exhaust his administrative remedies prior to filing this action. Thus, he may not proceed with his claims against Defendants Bradley, Brown, Groom, and Trask.[6]

## RECOMMENDATIONS

For the foregoing reasons, the undersigned recommends that:

1. The Motion for Summary Judgment [97] be GRANTED.

2. Plaintiff's claims against Defendants Dr. William Barr, Dr. James Burke, and Dr. Keith Stokes be dismissed with prejudice.

3. The Motion for Summary Judgment [101] be GRANTED.

4. Plaintiff's claims against Defendant Gloria Perry be dismissed with prejudice.

5. The Motion for Summary Judgment [104] be GRANTED.

6. Plaintiff's claims against Jody Bradley, Mary Groom, Karen Brown, and Olivia Trask be dismissed without prejudice.

7. If the above recommendations are adopted, that a final judgment be entered as all claims asserted in this matter will have been addressed and dismissed.

## NOTICE OF RIGHT TO OBJECT

In accordance with the Rules of this Court, any party, within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the District Judge, the U.S. Magistrate Judge, and the opposing party. The District Judge at that time may accept, reject, or modify in whole or in part the

---

[6] Exceptions to the exhaustion requirement are only appropriate where the administrative remedies are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would itself be patently futile. *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994). The Fifth Circuit has taken the position that exceptions to the exhaustion requirement only apply in "extraordinary circumstances," and that the prisoner bears the burden of demonstrating the futility or unavailability of administrative review. *Id.* Plaintiff has not made such a showing.

recommendation of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions. Failure to timely file written objections to proposed findings, conclusions, and recommendations contained in this report will bar an aggrieved party, except on the grounds of plain error, from attacking on appeal unobjected to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

This the 17th day of January, 2020.

s/ Michael T. Parker
United States Magistrate Judge